UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOSEPH WATLEY and          :
KARIN HASEMANN,            :
                           :
     Plaintiffs,           :
                           :
v.                         :    CASE NO. 3:13-cv-1858(RNC)
                           :
DEPARTMENT OF CHILDREN &   :
     FAMILIES,             :
JOETTE KATZ, and           :
VANNESSA DORANTES,         :
                           :
     Defendants.           :

RULING AND ORDER

Plaintiffs Joseph Watley and Karin Hasemann bring this

action against the Connecticut Department of Children & Families

("DCF), former DCF Commissioner Joette Katz, and current

Commissioner Vanessa Dorantes, claiming that DCF took custody of

their children, and ultimately obtained a final court order

terminating their parental rights, in violation of federal laws

protecting persons with disabilities.  The action has been

remanded following sua sponte dismissal of the original

complaint, which was filed pro se.  See ECF Nos. 9 (dismissing

case), 22 (order of Second Circuit vacating and remanding).  The

amended complaint, prepared by counsel, alleges violations of

the plaintiffs' rights under the Americans with Disabilities Act

("ADA"), 42 U.S.C. §§ 12131-12134; the Rehabilitation Act

("RA"), 29 U.S.C. § 794; and the Due Process Clause of the

1

Fourteenth Amendment, made enforceable under 42 U.S.C. § 1983.
Plaintiffs seek money damages to redress DCF's alleged
intentional discrimination and failure to provide reasonable
accommodations.  In addition, they seek injunctive relief
requiring DCF to adopt certain institutional reforms.[1]

Plaintiffs commenced this action in federal district court
after more than a decade of litigation in the trial and
appellate courts of Connecticut, including five neglect trials,
four termination of parental rights ("TPR") trials, and three
appeals.  Published decisions of state trial and appellate
courts in the underlying proceedings frame the present action.

---

[1] Counts one, two and three of the amended complaint are brought
under the ADA and RA.  These counts are construed as attempting
to obtain damages and injunctive relief against DCF, as
permitted by both statutes.  Neither statute provides for
recovery of damages against individuals, so I do not read these
counts as attempting to recover damages from defendants Katz and
Dorantes.  See De Figueroa v. New York, -- F. Supp. 3d --, 2019
WL 4221181, at *14 n.20 (E.D.N.Y. 2019).  Count four of the
amended complaint is brought under § 1983.  It is well-settled
that § 1983 does not provide a cause of action against a state
agency, Basak v. N.Y. State Dep't of Health, 9 F. Supp. 3d 383,
389 (S.D.N.Y. 2014) (quoting Will v. Mich. Dep't of Police, 491
U.S. 58, 62-71 (1989)), and that the cause of action it provides
against state officials is available only if the individual was
personally involved in the alleged deprivation of federal
rights, see, e.g., Carter v. Broome County, 394 F. Supp. 3d 228,
243 (N.D.N.Y. 2019) (noting that supervisory liability under
§ 1983 requires an individual defendant's own "culpable action
or inaction" and "personal involvement" in the violation).
Accordingly, I read this count as attempting to state a claim
for damages against former Commissioner Katz in her personal
capacity and a claim for injunctive relief against Commissioner
Dorantes in her official capacity.

<u>See</u> <u>In re Joseph W., Jr.</u>, 53 Conn. Supp. 1 (2013)(describing procedural history in detail).[2]  The decisions show the following:

- DCF obtained orders of temporary custody with regard to plaintiffs' children soon after each was born on the ground that the children would be in immediate physical danger if they were left in plaintiffs' care;

- DCF's subsequent actions affecting plaintiffs' parental rights were undertaken in conjunction with court orders

---

[2]  In adjudicating a motion to dismiss, a district court may take judicial notice of "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007).  In addition, the court may "take judicial notice of documents filed in other courts, . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." <u>Kramer v. Time Warner Inc.</u>, 937 F.2d 767, 774 (2d Cir. 1991).

Throughout this Ruling and Order, judicial notice is taken of factual findings and legal conclusions of state courts in the underlying proceedings.  The findings are not relied on for their truth but only for their preclusive effect.  <u>See</u> <u>Bristol v. Nassau Cty.</u>, 685 Fed. App'x 26, 28 (2d Cir. 2017) (affirming appropriateness of district court's "judicial noticing of decisions in related state criminal proceedings" because "[t]hese self-authenticating, publicly available records satisfied" the judicial notice rule "and bore directly on the question of issue preclusion"); <u>Apotex, Inc. v. Acorda Therapeutics, Inc.</u>, 823 F.3d 51, 60 (2d Cir. 2016) (holding that a court's consideration of matters subject to judicial notice does not impermissibly convert a ruling on a motion to dismiss into one for summary judgment).

requiring plaintiffs to take certain specific steps to regain
custody;

- the court-ordered steps and their implementation took
account of the requirement in the applicable state statute that
DCF make "reasonable efforts" to reunite a parent and child,
Conn. Gen. Stat. § 17a-112(j);

- the reasonable efforts requirement in state law aligns
with federal law, which prohibits a state from seeking to
terminate parental rights without first making reasonable
efforts to preserve the family, as required by the Adoption
Assistance and Child Welfare Act, 42 U.S.C. § 1305 (1980), and
the Adoption and Safe Families Act, 42 U.S.C. § 1305 (1997);

- the reasonable efforts requirement under state law
requires DCF to consider a parent's disabilities, including
mental disabilities;

- in the course of the proceedings leading to termination
of plaintiffs' parental rights ("TPR proceedings"), both
plaintiffs denied having any disability and resisted having to
cooperate with DCF and comply with court-ordered specific steps;

- plaintiffs asserted that the removal of the children from
their custody constituted discrimination based on their
perceived disabilities in violation of the ADA, that their
lawyers were ineffective in failing to adequately present

defenses under the ADA, and that an "ADA coordinator" should be present throughout court proceedings;

- plaintiffs were not given an ADA coordinator but they were given additional time and other assistance to meet the court-ordered steps and, on this basis, DCF was found to have met the reasonable efforts requirement before plaintiffs' parental rights were terminated.

Pending for decision is defendants' motion to dismiss all the claims in the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). Defendants contend that the claims for damages are barred by the Rooker-Feldman doctrine,[3] collateral estoppel, the statute of limitations, sovereign immunity and qualified immunity. They further contend that plaintiffs lack standing to seek injunctive relief. Discovery has been stayed at the request of the defendants over plaintiffs' objection pending a determination of whether plaintiffs have any legal basis on which they can proceed.

In opposing dismissal of the amended complaint, plaintiffs emphasize that before their parental rights were terminated, they were denied the assistance of an ADA coordinator. They contend that the denial violated Title II of the ADA, which provides, "no qualified individual with a disability shall, by

---

[3] Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983).

reason of such disability, be excluded from participation or denied the benefits of the services, programs or activities of a public entity." 42 U.S.C. § 12132. When plaintiffs requested an ADA coordinator, DCF took the position that Title II of the ADA did not apply in child protection proceedings, which was a common view, if not the prevailing view, at the time. See Michael Lanci, Note, In the Child's Best Interests? Rethinking Consideration of Physical Disability in Child Custody Disputes, 118 Colum. L. Rev. 875, 883 n.51 (2018) (citing In re Adoption of Gregory, 747 N.E.2d 120, 124 (Mass. 2001); In re Doe, 60 P.3d 285, 290-91 (Haw. 2002)).[4] The state trial court agreed with DCF that the ADA did not "create[] special obligations in a child protection proceeding." In re Joseph W., 2011 WL 5842570, at *5. Plaintiffs sought appellate review of this issue without success. In re Joseph W., 305 Conn. at 653 ("[W]e reject the ADA claim of the father . . . ."); In re Joseph W., 146 Conn. App. at 476 (rejecting the ADA claim of the mother).

In the amended complaint, plaintiffs allege that during the period 2002 to 2013, DCF violated the antidiscrimination provision of the ADA by removing their children, and later

_____

[4] It was commonly thought that the ADA/RA did not apply in child neglect and TPR proceedings on the ground that the primary concern in such a proceeding is the best interest of the child, not the best interest of the parent.

seeking termination of their parental rights, based on
discredited stereotypes about the parenting ability of persons
with mental disabilities.  They also contend that DCF violated
the ADA by failing to provide them with reasonable
accommodations enabling them to regain custody.  Because no
state court squarely addressed these claims in the underlying
proceedings, plaintiffs submit that they should be able to
litigate them here.

Defendants argue that plaintiffs cannot obtain relief on
the claims in the amended complaint without asking this court to
review and reject decisions made by the state courts.
Defendants' assessment is accurate.  A final termination of
parental rights cannot occur unless a state court makes certain
findings, including the crucial finding that "reasonable
efforts" to achieve reunification have been made by the state
with due regard for the parent's disabilities.  A claim in
federal court that parental rights have been unlawfully
terminated due to discrimination on the basis of disability
necessarily asks the federal court to review the state court's
decision and either vacate it or award damages or both.  But few
principles are as firmly established as the rule that prohibits
federal district courts from reviewing decisions of state
courts.  In our system of state and federal courts, the only
federal court empowered to review state court decisions is the

United States Supreme Court.  This rule applies even when the
state court has incorrectly decided an issue of federal law.

I recognize the profoundly serious nature of the harm for
which plaintiffs seek redress.  I also appreciate the role and
responsibility of the federal district court in ensuring access
to a federal trial proceeding for persons whose federal rights
have been violated by state officials.  Nevertheless, I conclude
that the amended complaint must be dismissed.

The primary obstacle to adjudication of the claims in the
amended complaint is the Rooker-Feldman doctrine, which provides
that federal district courts lack subject matter jurisdiction to
review state court judgments.  Plaintiffs have the burden of
demonstrating that subject matter jurisdiction exists,
notwithstanding Rooker-Feldman.  To meet this burden, it must be
shown that they can obtain relief on the claims in the amended
complaint without this court effectively reviewing and rejecting
a state court decision.  Unquestionably, had the state courts
squarely confronted the claims in the amended complaint and
rejected them on the merits, this court would lack jurisdiction
to review those decisions.  It is no different when, as here,
the state courts rejected the ADA claims in substance.

Not all of DCF's actions were undertaken pursuant to a
court order, so Rooker-Feldman is not a complete bar to the
claims in the amended complaint.  But other obstacles prevent

plaintiffs from proceeding on these claims: collateral estoppel bars relitigation of issues decided in state court; most of the actions complained of fall well outside the three-year statute of limitations; plaintiffs' claim for damages under § 1983 is unsupported by allegations necessary to state a claim for relief against former Commissioner Katz and cannot be maintained in any event because of qualified immunity; and plaintiffs lack standing to pursue injunctive relief. Accordingly, the amended complaint will be dismissed.

## I. Background

Plaintiffs are the biological parents of two sons, Joseph Jr. and Daniel. Ms. Hasemann is also the biological mother of a daughter, Kristina. DCF is the state agency responsible for responding to reports of child abuse and neglect, providing substitute care, and making efforts to reunite families before resorting to termination proceedings. Defendant Katz served as Commissioner of DCF from February 2011 to January 2019. Defendant Dorantes has been Commissioner of DCF since February 2019.[5]

Between 2002 and 2013, DCF pursued neglect and termination proceedings against the plaintiffs, ultimately resulting in the

---

[5] A court may take judicial notice of the dates of appointment or election of a public official. See, e.g., Gladden v. City of N.Y., No. 12-cv-7822 (PKC), 2013 WL 4647193, at *3 (S.D.N.Y. Aug. 29, 2013).

termination of Ms. Hasemann's parental rights with respect to all three children and Mr. Watley's parental rights with respect to Joseph Jr. and Daniel. All three children have been adopted and are reportedly doing well and plaintiffs do not seek an order overturning the termination of their parental rights. Rather, they seek damages for emotional distress and injunctive relief in the nature of systemic reforms to ensure DCF's future compliance with the ADA in connection with neglect and TPR proceedings.

Ms. Hasemann's interaction with DCF began in October 2002, when she gave birth to Kristina. Kristina was born prematurely at 34 weeks and required complex medical care. The hospital contacted DCF due to Ms. Hasemann's response to Kristina's birth. She "insisted the girl was a boy, [that the baby had] had a heart attack, and [that she] should be fed in an unusual and inappropriate pattern even though the food intake for this premature baby was crucial." In re Kristina H, No. L15CP02007724A, 2004 WL 886937, at *1 (Conn. Super. Ct. Apr. 2, 2004). She also informed the hospital she suffered from narcolepsy.[6]

---

[6] The state court found that Ms. Hasemann's "sense of reality impacted on her ability to be a fit mother," In re Kristina H, 2004 WL 886937, at *1 (finding that after Kristina's birth, the mother "was confused about whether there were two fetuses" and "reported she ha[d] delivered a brain").

On the basis of the hospital's report, DCF invoked a 96-hour hold under Connecticut law, which authorizes DCF to remove a child without parental consent for up to 96 hours if it has probable cause to believe the child is in imminent risk of physical harm and immediate removal is necessary to ensure the child's safety. Conn. Gen. Stat. § 17a-101g(e) and (f). DCF simultaneously went to court and sought an Order of Temporary Custody ("OTC"), which was granted on the ground that Kristina would be in immediate physical danger if she remained under the care of her mother.

The court issued preliminary "specific steps," which Ms. Hasemann was required to follow in order to regain custody. In re Kristina H., No. L15CP02007724A, 2007 WL 241218, at *1, *3, *7 (Conn. Super. Ct. Jan. 17, 2007) (citing Conn. Gen. Stat. § 46b-129). In 2004, "the court adjudicated Kristina neglected," and committed her "to the care, custody and guardianship of DCF." Id. at *1. DCF later filed a termination of parental rights petition. After a trial in 2007, Ms. Hasemann's parental rights were terminated. Id. at *1, *27.

Joseph Jr. and Daniel were born in July 2005 and July 2006, respectively. Soon after each was born, the state court issued an OTC.[7] In both cases, the court issued specific steps for both

---

[7] Joseph Jr. was born in Pennsylvania after plaintiffs left Connecticut late in Ms. Hasemann's pregnancy. In re Joseph W.,

plaintiffs.  In re Joseph W., Jr., 53 Conn. Supp. at 2, 5-6.

DCF's neglect petitions alleged "predictive neglect," which

requires a showing that under the parents' care, it is "more

likely than not" that the child would be "denied proper care and

attention physically, educationally, emotionally or morally."

Id. at 5 (citing In re Joseph W., 305 Conn. 633, 648-49 (2012)).[8]

In December 2007, soon after Ms. Hasemann's parental rights

were terminated with regard to Kristina, DCF filed termination

of parental rights petitions with regard to Joseph Jr. and

Daniel.  Id. at 7.  After a trial in October 2008, the court

terminated plaintiffs' parental rights with respect to both

children.  Id.  The Appellate Court reversed the judgment of the

trial court on the ground that Mr. Watley had not been given an

adequate opportunity to contest a finding of neglect.  Id. at 8

_____

Nos. L15CP05008039A, L15CP05008191A, 2008 WL 4635639, at *4
(Conn. Super. Ct. Oct. 1, 2008), rev'd 121 Conn. App. 605
(2010).  Joseph Jr. was removed from plaintiffs' custody by
Pennsylvania authorities due to Ms. Hasemann's "reportedly
bizarre behavior" and subsequently placed in DCF custody
pursuant to an OTC.  Id.; see also In re Joseph W., Jr., 53
Conn. Supp. 1, 36 (Super. Ct.), aff'd, 146 Conn. App. 468
(2013), cert. denied, 310 Conn. 950.  Daniel was born in
Connecticut and removed by DCF under a "ninety-six hour hold."
Id. at 49.

[8] The predictive neglect doctrine has been criticized.  See,
e.g., Alissa Bang, Note, What do Judges and Fortune Tellers Have
in Common? Connecticut's Predictive Neglect Doctrine as a Basis
for Premature Suspension of Parental Rights, 32 Quinnipiac Prob.
L.J. 410, 411 (2019) ("[I]n practice, this doctrine is
effectively discriminatory and severely disadvantageous for
parents with psychiatric disabilities.").

(citing In re Joseph W., Jr., 301 Conn. 245 (2011)).  In 2011,
the Connecticut Supreme Court agreed with the decision of the
Appellate Court and remanded the case for a new trial.  In re
Joseph W., Jr., 301 Conn. at 248.

Following another trial in April 2012, the trial court
again terminated plaintiffs' parental rights.  See In re Joseph
W., Jr., 53 Conn. Supp. at 9.  This judgment also was reversed
on appeal.  The Connecticut Supreme Court held that a third
trial was necessary because the trial court had applied the
wrong standard of proof for determining "predictive neglect."
In re Joseph W., 305 Conn. at 645, 648.

After a third trial in December 2012, the trial court
terminated plaintiffs' parental rights, the Appellate Court
affirmed, and the Connecticut Supreme Court denied certiorari.
See In re Joseph W., Jr., 53 Conn. Supp. 1, 192, aff'd, 146
Conn. App. at 477, cert. denied, 310 Conn. at 950.

In the course of the underlying proceedings, plaintiffs
were evaluated by a number of professionals, sometimes at the
direction of DCF and sometimes by court order.  See, e.g., id.
at 17, 21-23, 29, 42-43, 146.  Ms. Hasemann was found to have
severe narcolepsy, schizotypal personality disorder, attention-
deficit/hyperactivity disorder, chronic functional impairments,
cognitive disorder not otherwise specified, cognitive deficits,
antisocial personality disorder, and major depression.  She also

13

may suffer from the residual effects of a frontal lobe brain tumor removal that occurred when she was sixteen. Mr. Watley has been found to have "a personality disorder not otherwise specified." He receives Social Security Disability Insurance benefits because of a spinal injury resulting from a car accident.

## II. Legal Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Nike, Inc. v. Already, LLC, 663 F.3d 89, 94 (2d Cir. 2011) (quotation marks and citation omitted), aff'd, 568 U.S. 85 (2013). The party asserting subject matter jurisdiction has the burden of proving its existence by a preponderance of the evidence. Luckett v. Bure, 290 F.3d 493, 497 (2d Cir. 2002).

To survive a motion to dismiss for failure to state a claim on which relief may be granted under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim satisfies the plausibility standard if it is supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

III. <u>Discussion</u>

In the following sections, I first address the issue of sovereign immunity and conclude that the state has waived its Eleventh Amendment immunity under the RA, which makes it unnecessary to decide whether the ADA abrogates a state's sovereign immunity.  I then address the claims for money damages, first under the ADA and RA, then under § 1983.  I conclude that the claims under the ADA and RA are barred by <u>Rooker-Feldman</u>, collateral estoppel and the statute of limitations, and that the claim under § 1983 is similarly barred.  I also conclude that plaintiffs cannot recover damages under § 1983 because they do not plausibly allege that former Commissioner Katz was personally involved in the alleged deprivation of federal rights.  I further conclude that even if plaintiffs could plausibly state such a claim, it would have to be dismissed based on qualified immunity.  Finally, I address the issue of plaintiffs' standing to seek injunctive relief and conclude that their allegations are insufficient to support standing under Article III to seek the injunctive relief set forth in the amended complaint.

A.    <u>Sovereign Immunity</u>

The Eleventh Amendment to the United States Constitution "generally bars suits in federal court by private individuals against non-consenting states."  <u>Leitner v. Westchester Cmm'ty</u>

Coll., 779 F.3d 130, 134 (2d Cir. 2015) (citing Port Auth.

Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990)).

Eleventh Amendment immunity "encompasses not just actions in

which the state is actually named as a defendant, but also

certain actions against state agents and instrumentalities,

including actions for the recovery of money from the state."

Id. (quoting Regents of the Univ. of Cal. v. Doe, 519 U.S. 425,

429 (1997)). Eleventh Amendment immunity is subject to the

exception articulated in Ex parte Young, 209 U.S. 23 (1908),

which allows for injunctive relief. See Milliken v. Bradley,

433 U.S. 267, 289 (1977) (noting that the Ex parte Young

exception "permits federal courts to enjoin state officials to

conform their conduct to requirements of federal law").[9]

DCF (and Commissioner Dorantes in her official capacity)

may invoke Eleventh Amendment immunity. Bhatia v. Conn. Dep't

of Children & Families (DCF), 317 Fed. App'x 51, 52 (2d Cir.

2009). Therefore, plaintiffs cannot obtain money damages under

---

[9] Defendants argue that the Ex parte Young exception does not
apply because plaintiffs do not have standing to seek an
injunction. Def. Mem. at 34. Because a lack of standing
eliminates a court's subject matter jurisdiction, Pinson v.
JPMorgan Chase Bank, Nat'l Ass'n, 942 F.3d 1200, 1206 (11th Cir.
2019), defendants may well be correct. It would offend
sovereign immunity to require a state to defend a suit in
federal court even though subject matter jurisdiction is
lacking. However, because I conclude that plaintiffs do not
have standing to seek injunctive relief, I need not determine
the applicability of Ex parte Young.

the ADA and RA unless the state has consented to suit or
Congress has validly abrogated the state's immunity.  NAACP v.
Merrill, 939 F.3d 470, 475 (2d Cir. 2019).  Congress may
override the Eleventh Amendment when it legislates pursuant to §
5 of the Fourteenth Amendment.  Fitzpatrick v. Bitzer, 427 U.S.
445 (1976).  The ADA contains a purported abrogation of Eleventh
Amendment immunity, and the RA contains a purported waiver
clause for state agencies that accept federal funding.  See
Garcia v. S.U.N.Y. Health Sci. Cent. of Brooklyn, 280 F.3d 98
(2d Cir. 2001).[10]

In Garcia, the Court of Appeals examined the ADA and RA to
assess their impact on a state's sovereign immunity.  The Court
concluded that the ADA's abrogation is valid as to conduct
motivated by "discriminatory animus or ill will due to

_____

[10] As plaintiffs note, and defendants do not contest, it does not
matter for present purposes whether immunity is abrogated by the
ADA, or waived under the RA, so long as one of the two validly
eliminates the state's immunity.  "[T]he rights and remedies
under Title II of the ADA are identical to those under the
Rehabilitation Act."  T.W. v. N.Y. St. Bd. of Law Examiners, No.
16-cv-3029 (RJD), 2019 WL 6034987, at *3 (E.D.N.Y. Nov. 14,
2019).  At this stage, then, immunity need only fail under one
statute or the other.  See id.; Ross v. City Univ. of N.Y., 211
F. Supp. 2d 518, 528 (E.D.N.Y. 2016) ("Because sovereign
immunity does not bar plaintiff's Rehabilitation Act claim, the
court has subject matter jurisdiction over this action
regardless of CUNY's immunity from the ADA claim.  Consequently,
there is no risk of violating CUNY's 'right not to be haled into
court' when it is immune from suit. . . . [A]s a practical
matter, this case will proceed on the same course regardless of
whether CUNY may later be found immune from plaintiff's ADA
claim.").

disability." See 280 F.3d at 112. The Court also stated that the RA expresses Congress's clear "intent to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment immunity." Id. at 113.

The Garcia court concluded that, under the circumstances presented there, the defendant could have believed it had already lost its immunity under the ADA's abrogation, so its acceptance of federal funds was not a knowing waiver of immunity under the RA; the state agency could not have knowingly waived a right it did not believe it possessed. See id. at 113-15.

After Garcia, a state accepting federal funds would know that the validity of the ADA's abrogation was "far from clear." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 495-96 (4th Cir. 2005). DCF accepted federal funding in that context, thereby waiving its immunity under the RA. Accordingly, the Eleventh Amendment does not bar plaintiffs' suit. See Garcia, 280 F.3d at 113-14; Ross, 211 F. Supp. 3d at 528.[11]

_____

[11] Plaintiffs allege that DCF's alleged misconduct meets the test of animus or ill will announced in Garcia. There is an unsettled question about the status of Garcia after the Supreme Court's decision in United States v. Georgia, 546 U.S. 151, 159 (2006)(holding that the ADA's abrogation is valid as applied to suits alleging conduct that violates the Fourteenth Amendment). See Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178, 194-95 (2d Cir. 2015). Because I conclude that Connecticut waived its immunity under the RA, I do not need to resolve this question and therefore do not reach it.

B.  Claims for Damages

1.  Count One: Intentional Discrimination Under the ADA/RA

In count one, plaintiffs allege that they are each
disabled, or regarded by defendants as disabled, and that DCF
intentionally discriminated against them by

> (1) placing Joe Jr. and Daniel into foster care based on
> stereotypes and assumptions based on Plaintiffs'
> disabilities, (2) failing to provide Plaintiffs with
> family supports even though Mr. Watley and Ms. Hasemann
> had good family supports, (3) denying Plaintiffs equal
> opportunities to participate in and benefit from its
> services, programs, and activities; (4) utilizing
> criteria and methods of administration having the effect
> of discriminating against Plaintiffs on the basis of
> disability and defeating or substantially impairing
> accomplishment of the objectives of its rehabilitation
> and/or reunification program with respect to Plaintiffs;
> and (5) failing to reasonably modify its policies,
> practices, and procedures where necessary to avoid
> discriminating against Plaintiffs on the basis of their
> disability.

Am. Compl. ¶ 95 (citations omitted).  They further allege that
DCF "failed to (1) implement appropriate reunification services
. . . (2) identify appropriate tasks; [and] (3) assist
Plaintiffs in meeting tasks to achieve rehabilitation
reunification," as well as failing to impose "only necessary and
legitimate safety requirements."  Id. ¶ 97.  They also claim DCF
acted with deliberate indifference.  Id. ¶ 100.

a.  Legal Standards

To establish a violation under the ADA or RA, "plaintiffs
must demonstrate that (1) they are 'qualified individuals' with

a disability; (2) that the defendants are subject to the ADA;
and (3) that plaintiffs were denied the opportunity to
participate in or benefit from defendants' services, programs,
or activities, or were otherwise discriminated against by
defendants, by reason of plaintiffs' disabilities." Henrietta
D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).[12]

To establish that discrimination occurred "by reason of"
their disabilities, plaintiffs must demonstrate that disability
discrimination was a "but-for cause of any adverse" action.
Natofsky v. City of New York, 921 F.3d 337, 348 (2d Cir. 2019);
see also id. at 349 ("We conclude that 'on the basis of' in the
ADA requires a but-for causation standard.").[13] Using this but-

---

[12] Though there are "subtle differences" between the ADA and the
RA, the standards governing liability under the two statutes are
generally the same. Henrietta D., 331 F.3d at 272. Thus,
"unless one of those subtle distinctions is pertinent . . .,
[courts] treat claims under the two statutes identically." Id.
To establish a claim under the RA, a plaintiff must also
establish "that the defendants receive federal funding." Id.
DCF does not dispute that it receives federal funding.

[13] Prior to Natofsky, plaintiffs bringing claims under the ADA
could recover based on a "mixed-motive" standard rather than the
more stringent but-for standard. See Parker v. Columbia
Pictures Indus., 204 F.3d 326, 336 (2d Cir. 2000). However, in
2009, the Supreme Court held that distinctions in language
between Title VII, which allows for mixed-motive claims, and the
ADEA foreclosed mixed-motive theories under the latter statute,
and required but-for causation under the ADEA. See Gross v. FBL
Fin. Servs., Inc., 557 U.S. 167, 174 (2009). After Gross, the
Second Circuit joined several others in holding that, because
the ADA's language more closely resembles the ADEA's language
than it does Title VII's language, the ADA requires but-for
causation. Natofsky, 921 F.3d at 348. Because the RA

20

for standard, plaintiffs can pursue three theories of discrimination: disparate impact, disparate treatment, and failure to make reasonable accommodations.   See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48 (2d Cir. 2002) (recognizing availability of all three theories under ADA, RA, and Fair Housing Act), superseded by statute on other grounds.  "Regardless of a plaintiff's theory of liability," they must show but-for causation.  H.P. ex rel. W.P. v. Naperville Cmty. Unit Sch. Dist. #203, 910 F.3d 957, 960 (7th Cir. 2018).

     b.  Analysis

I conclude that the claims of direct discrimination in count one are precluded by the Rooker-Feldman doctrine, collateral estoppel and the statute of limitations.

     i. Rooker-Feldman

The Rooker-Feldman doctrine prevents a party who has lost in state court from obtaining review of the state court judgment by a federal district court.  See Lance v. Dennis, 546 U.S. 459 (2006); Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005).  The doctrine applies if four requirements are met: 1) the plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by the state court

---

incorporates the ADA's causation standard, the RA also requires but-for causation after Natofsky.  See id. at 346–47.

21

judgment; (3) the plaintiff must ask the district court to review and reject that judgment; and (4) the state court judgment must have been rendered before the district court proceedings commenced.  Green v. Mattingly, 585 F.3d 97, 101 (2d Cir. 2009) (citing Hoblock v. Albany Cty. Bd. of Elections, 422 F.3d 77, 85 (2d Cir. 2005)).

Rooker-Feldman applies broadly to any suit that, in effect, seeks review of or damages based on a state court judgment.  It precludes, for example, any claim "seek[ing] vacatur or rejection of [an] order terminating [plaintiffs'] parental rights."  Voltaire v. Westchester Cty. Dep't of Soc. Servs., No. 11-cv-8876 (CS), 2016 WL 4540837, at *9 (S.D.N.Y. Aug. 29, 2016).  But it also precludes an award of damages stemming from an injury sustained as a result of a state court determination. See id. at *11 (citing Lomnicki v. Cardinal McCloskey Servs., No. 04-cv-4548, 2007 WL 2176059, at *5 (S.D.N.Y. July 26, 2007) and McClean v. City of N.Y., No. 04-cv-8353, 2007 WL 415138, at *4 (S.D.N.Y. Feb. 6, 2007)); Sample v. Monterey Cty. Family & Children Servs., No. C09-01005 HRL, 2009 WL 2485748, at *3 (N.D. Cal. Aug. 7, 2009) ("Although [plaintiff] asks for monetary damages, she would only receive a damage award if this court determined that the Dependency Court's decisions pertaining to the custody of her children — including any review or authorization of defendants' actions — were in error.");

Lomnicki v. Cardinal McCloskey Servs., No. 04-CV-4548 (KMK),
2007 WL 2176059, at *5 (S.D.N.Y. July 26, 2007) ("Plaintiff does
not avoid Rooker-Feldman by seeking damages instead of
injunctive relief. In order to award damages to Plaintiff, the
Court would have to review the decision of the Family Court.").

Rooker-Feldman can apply even if the claim presented in
federal court was not presented in state court.  The doctrine
bars "not only claims that involve direct review of a state
court decision, but also claims that are 'inextricably
intertwined' with a state court decision."  See Swiatkowski v.
Bank of Am., NT & SA, 103 F. App'x 431, 432 (2d Cir. 2004).
When a federal plaintiff relies on a legal theory not raised in
state court, Rooker-Feldman will apply if the federal suit
"complains of injury from a state-court judgment and seeks to
have that state-court judgment reversed."  Hoblock, 422 F.3d at
86.

In Hoblock, the Court of Appeals stated that a father whose
parental rights have been terminated in state court "may not"
sue in federal court on the theory that the judgment violates
his substantive due process rights "regardless of whether he
raised any constitutional claims in state court."  Id. at 87.
That observation is consistent with decisions of the Second
Circuit concerning the impact of Rooker-Feldman in cases brought
to federal court following child custody proceedings in state

23

court.[14]  District courts in this Circuit have likewise applied

Rooker-Feldman to ADA claims that required review of state court

decisions concerning child custody.[15]

The issue, then, is whether plaintiffs complain of injuries

sustained as a result of decisions of state courts.  Plaintiffs

contend their injuries were caused by DCF rather than any

judicial decision.[16]  Defendants disagree.  They contend that

plaintiffs complain of injuries from state court decisions.

---

[14] See, e.g., Green, 585 F.3d at 103 (noting that Rooker-Feldman would bar a § 1983 action following a final order permanently removing plaintiff's child from her custody); Phifer v. City of N.Y., 289 F.3d 49, 57 (2d Cir. 2002) ("To the extent that Phifer alleges in her complaint that certain defendants who were associated with Amkia's case in the family court were motivated by racism in their recommendations, representations, or requests to the family court, we find that Rooker-Feldman bars these claims.").

[15] See Johnson v. Myers, No. 10-cv-1964, 2014 WL 2744624, at *6 (E.D.N.Y. June 16, 2014) (Fourteenth Amendment claims based on child neglect investigation and prosecution barred by Rooker-Feldman), vacated on other grounds and remanded sub nom. Myers v. Patterson, 819 F.3d 625 (2d Cir. 2016); Skipp v. Conn. Judicial Branch, No. 3:14-CV-00141(JAM), 2015 WL 1401989, at *6 (D. Conn. Mar. 26, 2015) (stating that review of reasonable accommodations claims would "require me to sit in judgment of determinations made by state courts respecting accommodations that were made for plaintiff's disability"); Richter v. Conn. Judicial Branch, No. 3:12CV1638(JBA), 2014 WL 1281444, at *8 (D. Conn. Mar. 27, 2014) (applying Rooker-Feldman where plaintiff alleged state court judgments "were the result of discrimination under the ADA and have caused her injury"), aff'd, 600 F. App'x 804 (2d Cir. 2015).

[16] At oral argument, plaintiffs' counsel stated that plaintiffs' damages "predated any judgment entered by [a] state court."

"[A] federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." Cho v. City of New York, 910 F.3d 639, 646 (2d Cir. 2018) (quoting Hoblock, 422 F.3d at 88). See also GASH Assocs. v. Village of Rosemont, 995 F.2d 726, 729 (7th Cir. 1993)(relevant question under Rooker-Feldman is whether "the injury of which [plaintiff] complains . . . [was] caused by the judgment," or did the plaintiff merely "suffer an injury out of court and then fail to get relief from state court?").

I agree with defendants that plaintiffs are seeking relief for injuries caused by state court decisions, which this court lacks jurisdiction to review under Rooker-Feldman.[17]  The removal and placement of plaintiffs' children in foster care, provision of specific steps, determination of their visitation schedule, and termination of their parental rights took place pursuant to

---

[17] The first and final parts of the Rooker-Feldman test are not in serious dispute; prior to commencing this action, the plaintiffs repeatedly lost in state court. See In re Joseph W., Jr., 53 Conn. Supp. at 5-11, 35-36, 49-50, 61-62, 69-77 (discussing procedural history); In re Joseph W., Jr., 146 Conn. App. 468 (affirming the trial court judgment); In re Joseph W., Jr., 310 Conn. 950 (denying certiorari).  Similarly, because an award of damages based on a state court judgment is equivalent for Rooker-Feldman purposes to an injunction overturning the judgment, the third element of the test is met.  See supra (citing cases).

state court orders.  See In re Joseph W., Jr., 53 Conn. Supp. at

5-6, 36, 49, 61-62, 69-77.  In addition, the state courts

rejected plaintiffs' requests for an ADA coordinator to be

present during court proceedings; ruled that they had

substantially failed to comply with the specific steps the

courts had identified; determined that placement with

plaintiffs' family members was not appropriate; and, in most

instances, dictated the providers from whom plaintiffs could

receive treatment.  See id. at 10-11, 21, 48, 61-62, 74-75, 98-

99, 104, 117-20, 142-45, 156-57, 169-75; see also Bristol, 685

Fed. App'x at 28 (confirming that district court could

judicially notice state court decisions that "bore directly on

the question of issue preclusion").  To recover damages based on

any of these matters, plaintiffs must demonstrate that the state

courts erred.  Rooker-Feldman dictates that this court abstain

from engaging in substantive review of the state courts'

decisions.

ii. Collateral Estoppel

In addition to the jurisdictional bar posed by Rooker-

Feldman, collateral estoppel – or issue preclusion – bars

relitigation of issues decided by the state courts in the

underlying proceedings.  See Hoblock, 422 F.3d at 87-88, n.6.

"In Connecticut, to be subject to collateral estoppel, an issue

must have been (1) fully and fairly litigated, (2) actually

decided, (3) necessary to the judgment in the first action, and (4) identical to the issue to be decided in the second action." Wanamaker v. Town of Westport Bd. of Educ., 11 F. Supp. 3d 51, 66 (D. Conn. 2014). Preclusive effect will be given to the final judgment of a trial court, so long as it has not been set aside, as well as to the final judgment of an appellate court. See Restatement (Second) of Judgments §§ 13, 27 & cmt. o (1982); Stone v. Williams, 970 F.2d 1043, 1054 (2d Cir. 1992) (noting that issue preclusion "prevent[s] relitigation of an issue of fact or law that has already been necessarily decided as part of a valid, final judgment").

Collateral estoppel precludes relitigation of the issue at the heart of plaintiffs' complaint – the propriety of DCF's decision to seek termination of their parental rights based on a finding of "predictive neglect."[18] Plaintiffs claim that this decision was based on unlawful stereotyping and discrimination. Am. Compl. ¶¶ 29, 52, 69. Defendants answer that DCF's decision was based on the need to protect the children from harm, as authorized by the "direct threat" exception under the ADA and RA. 28 C.F.R. § 35.139(a). They argue that collateral estoppel

---

[18] Rooker-Feldman bars review of the state courts' decision to actually terminate plaintiffs' parental rights. However, for purposes of this analysis, I assume that DCF's decision to seek termination of plaintiffs' parental rights can itself be the source of a redressable injury.

applies because plaintiffs cannot successfully challenge DCF's decision to seek termination of their parental rights without having this court review and reject the state courts' resolution of issues regarding the applicability of the direct threat exception. I agree.[19]

ADA-covered entities are not required "to permit an individual to participate in or benefit from" their programs or services if doing so would be a "direct threat to the health or safety of others." 28 C.F.R. § 35.139(a); see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 219-21 (2d Cir. 2001); Doe v. Deer Mountain Day Camp, Inc., 682 F. Supp. 2d 324, 345-50 (S.D.N.Y. 2010).[20] The ADA defines "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or

---

[19] Defendants make this argument in the context of Rooker-Feldman. See Def. Reply at 5. But I think it is more appropriate to consider the argument as a basis for applying collateral estoppel.

[20] See also Protecting the Rights of Parents and Prospective Parents with Disabilities, U.S. Dep't of Health & Human Servs. & U.S. Dep't of Justice (Aug. 10, 2015), https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html ("Under Title II of the ADA or Section 504 [of the RA], in some cases, a parent or prospective parent with a disability may not be appropriate for child placement because he or she poses a significant risk to the health or safety of the child that cannot be eliminated by a reasonable modification. This exception is consistent with the obligations of child welfare agencies and courts to ensure the safety of children.") (footnote marker omitted) (citing Sch. Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 287 (1987); 28 C.F.R. § 35.139(a)-(b)).

procedures or by the provision of auxiliary aids or services."
42 U.S.C. § 12182(b)(3).  To determine whether an individual
poses a significant risk to health or safety under the ADA, "a
public entity must make an individualized assessment, based on
reasonable judgment that relies on current medical knowledge or
on the best available objective evidence, to ascertain: the
nature, duration, and severity of the risk; the probability that
the potential injury will actually occur; and whether reasonable
modifications of policies, practices, or procedures or the
provision of auxiliary aids or services will mitigate the risk."
28 C.F.R. § 35.139(b).

Under Connecticut law, a court may terminate an
individual's parental rights only if it finds that: (1) DCF has
made "reasonable efforts" to reunify the parent and child, (2)
termination is in the best interest of the child, and (3) one of
several statutory grounds for termination is present, including,
as relevant here, that the child is neglected and the parent has
failed to achieve reunification.  See In re Joseph W., 53 Conn.
Supp. at 2-3, 141-43 (citing Conn. Gen. Stat. § 17a-112(j)).  To
establish predictive neglect (so as to satisfy the final prong),
the state must show "on the basis of evidence of events
preceding the filing of the neglect petition" that "it was more
likely than not" that if the child had remained with the parent
or parents, "the child would have been" neglected.  In re Joseph

W., Jr., 53 Conn. Supp. at 127 (brackets omitted) (quoting In re
Joseph W., 305 Conn. at 648-49). Specifically, the state must
show "that if the child were to remain in [the] parent's
independent care, the child would be 'denied proper care and
attention, physically, educationally, emotionally or morally
. . . or would [be] permitted to live under conditions,
circumstances or associations injurious to the well-being of the
child or youth.'" Id. (quoting In re Joseph W., 305 Conn. at
649).

In the underlying proceedings, the state courts decided
that the predictive neglect doctrine was "correctly invoked."
Id. at 128. In doing so, they necessarily determined that
leaving the children in the care of the plaintiffs would be
"injurious" to the "well-being" of the children. See id. at
127. And for the state courts to terminate plaintiffs' parental
rights, they had to find that DCF made "reasonable efforts" at
reunification. Id. at at 2-3, 141-43. In substance, then, the
state courts determined that reunification would pose a
significant risk to the health or safety of the children and
that the risk could not be eliminated by a reasonable
modification.

The final trial court's findings concerning the risk to the
children and DCF's reasonable efforts at reunification were
necessary to the judgment. A finding of probable harm was

necessary to the neglect ruling, a finding that DCF had made reasonable efforts at reunification was also necessary to the neglect ruling, and the neglect ruling was necessary to the termination of plaintiffs' parental rights.  See In re Joseph W., Jr., 53 Conn. Supp. at 2-3, 141-42; 150-151; 178-79; 182; 188-89.

To reject the direct threat defense in this case, it would be necessary to reject findings of fact made by the final trial court in its decision terminating plaintiffs' parental rights, which was affirmed on appellate review.  The court found that "mother, aided by father, continued to engage in a cyclical pattern of conceiving children, whose custody, of necessity, had to be assumed by the state at birth in order to protect them from the real risk of imminent and serious harm that every professional who has ever evaluated and observed mother try to care for her children has noted as a serious concern."  In re Joseph W., Jr., 53 Conn. Supp. at 136.  The court also found that, "[l]ike mother, father showed an inability to safely supervise his children." Id. at 160.  These factual findings – that the children were likely to be harmed if left in plaintiffs' care - are identical to the factual issues pertinent to the direct threat defense.  Cf. Jensen v. Foley, 295 F.3d 745, 747-48 (7th Cir. 2002) (state court's finding "that probable cause exists to believe that the child is neglected"

under state law precludes Fourth Amendment claim because state law issue is identical to whether "taking is supported by probable cause to believe that the child would be subject to the danger of abuse if not removed," and therefore the federal court was "barred by the doctrine of issue preclusion from reconsidering the issue").

Plaintiffs argue that because DCF and the state courts failed to appreciate the applicability of the ADA, their ADA and RA claims were not fully and fairly litigated or necessary to the judgment. Plf. Mem. at 20. But the issues fully and fairly litigated, actually decided, and necessary to the final state court judgment are inextricably intertwined with the ADA and RA claims presented here. The state court's findings and conclusions regarding those issues – e.g., that reunification would pose a danger to the children – operate to preclude the plaintiffs from stating an ADA/RA claim by conclusively establishing the direct threat defense as a matter of law at the motion-to-dismiss stage. See Matusick v. Erie Cty. Water Auth., 757 F.3d 31, 49 (2d Cir. 2014) (holding that even if the legal frameworks and standards applicable in two proceedings are not identical, the factual findings supporting the first judgment are given preclusive effect).

Plaintiffs further contend that it was never conclusively established in the underlying proceedings that DCF's actions

were reasonable under the ADA. However, the state courts recognized that the reasonable efforts required of DCF to achieve reunification of a parent and child include "taking the parent's mental condition into consideration" and "failure to provide adequate services because of the parent's mental condition would violate not only [Connecticut law], but the ADA." In re Antony B., 54 Conn. App. 463, 473 n.9 (Conn. App. Ct. 1999); see also id. ("[W]e do not suggest that the ADA does not apply to the reunification services and programs that the department must make to meet the parents' specialized needs."). On the second appeal in the underlying proceedings, the Connecticut Supreme Court confirmed that In re Antony B.'s discussion of the ADA applies to neglect proceedings, and affirmed the trial court's rejection of plaintiffs' ADA claims. In re Joseph W., 305 Conn. at 650. On remand, the trial court stated: "Based on the law and the facts . . . the ADA has not been violated in this case. . . . Under the particular circumstances of this case, the department made reasonable efforts even considering any ADA related issues. The respondents were not discriminated against under the ADA." In re Joseph W., 2012 WL 1759377, at *42–43. Because the requirements of state and federal antidiscrimination law are substantially the same in this respect, a federal plaintiff's ADA claims will generally be precluded when, as here, the state

court has determined that DCF made reasonable efforts at reunification.  Cf. In re Hicks/Brown, 893 N.W.2d at 639-40 (holding that, under Michigan law, the requirement that the state make "reasonable efforts to reunify a family before seeking termination of parental rights" entailed making "reasonable modifications" under the ADA).

Even if it were possible for DCF to comply with state law and nonetheless violate the ADA, collateral estoppel would still apply in this case.  See Miller v. Nichols, 586 F.3d 53, 61 (1st Cir. 2009) (dismissing claims under the ADA and RA that the state "fail[ed] to accommodate the parents' needs in the context of the reunification obligation" because the underlying facts were litigated in state court), cert. denied, 559 U.S. 1008 (2010).  The final trial court found that DCF made reasonable (indeed "extraordinary") efforts at reunification and plaintiffs failed to rehabilitate.  In re Joseph W., Jr., 53 Conn. Supp. at 145; see id. at 143-182.  These findings preclude plaintiffs from seeking to prove they were denied reasonable accommodations that would have enabled them to avoid termination of their parental rights.

That collateral estoppel bars the reasonable accommodations claim is confirmed by examining in detail each of plaintiff's allegations in light of the findings of the state courts. Plaintiffs allege that DCF failed to provide reasonable

34

accommodations by: (a) failing to identify appropriate tasks and
assist plaintiffs in meeting those tasks; (b) failing to provide
meaningful visitation opportunities; (c) refusing to allow Ms.
Hasemann to treat with her preferred provider, Sally Guest; (d)
refusing to allow plaintiffs to treat with providers near their
homes; (e) refusing to consider placement with their family
members and failing to provide "family supports"; and (f)
refusing to provide an ADA coordinator.  See Am. Compl. ¶¶ 43,
70, 72, 76, 79, 95, 97.

With the exception of the last allegation (discussed
below), all these allegations are in direct conflict with the
findings of the final trial court.  Taking each allegation in
turn, the state court found the following: (a) "the parents were
provided with specific steps to take to facilitate the return of
Joseph and Daniel," In re Joseph W., Jr., 53 Conn. Supp. at 153,
and  largely failed to comply with those steps, see id. at 153-
78; (b) DCF "complied with court orders that the parents be
given more liberal visitation than is usually offered upon
removal, particularly to parents who fail to comply with
services necessary to address their parental and mental health
deficiencies," id. at 169; (c) DCF "attempted to work with
mother's self-referred counselor, Sally Guest, but was met with
a lack of cooperation from Guest," id. at 145; (d) both parents
repeatedly refused to engage with medical providers and stopped

treating with any providers after 2007 (in the case of Ms. Hasemann) and 2008 (in the case of Mr. Watley), see id. at 75-77, 104, 116-17, 121; and (e) there was no evidence plaintiffs in fact requested placement with their family members; Ms. Hasemann's parents' home would, in any event, not have been "a safe or suitable choice for the children"; and placement with Mr. Watley's family "was never credible," id. at 159, 165, 170.

Based on the foregoing analysis, I conclude that plaintiffs are precluded from proceeding on the claim for direct discrimination under count one. The state courts addressed the acts and omissions alleged here. Factual issues bearing on the plaintiffs' claim were fully and fairly litigated and necessary to the reasonable efforts determination, which was necessary to the final judgment finding the children neglected and terminating plaintiffs' parental rights. See In re Joseph W., Jr., 53 Conn. Supp. at 182.

The only potential exception is the plaintiffs' allegation that they should have been given an ADA coordinator. The state courts conclusively determined that plaintiffs were not entitled to an ADA coordinator in connection with the court proceedings. See In re Joseph W., 305 Conn. at 640, 652; In re Joseph W., Jr., 146 Conn. App. at 475-76. But they did not explicitly consider whether the ADA imposed an obligation to appoint an ADA coordinator during reunification efforts prior to the

commencement of the trial proceedings.  Moreover, the final

appellate court noted that plaintiffs' request for an ADA

coordinator "was directed only to the trial proceeding."  Id. at

475 n.5.

Nevertheless, plaintiffs are barred from trying to

establish that appointment of an ADA coordinator during

reunification efforts would have enabled them to regain custody.

The final trial court found that "[w]ithout success, [DCF] did

everything possible to properly assess the parents' deficiencies

and address them."  In re Joseph W., Jr., 53 Conn. Supp. at 185

(emphasis added).  In other words, the court found that, as a

factual matter, plaintiffs could not have benefitted from

additional supports.[21]

Plaintiffs' counsel suggested at oral argument that

discovery might enable them to surmount the obstacles to

litigation of their claims posed by Rooker-Feldman and

collateral estoppel.  In ruling on the motion to dismiss,

---

[21] Plaintiffs have not alleged with specificity what an ADA
coordinator would have done to enable them to regain custody.
They may believe that an ADA coordinator would have arranged for
as yet unidentified but nonetheless significant accommodations
in the form of supports and services that would have enabled
them to achieve the specific steps required to regain custody.
Assuming that is their position, they have not met their burden
of alleging "the existence of a plausible accommodation, the
costs of which, facially, do not clearly exceed its benefits."
Henrietta D., 331 F.3d at 281 (quoting Borkowski, 63 F.3d at
138).

however, the court must assess the plausibility of the claims based on the amended complaint without speculating about discovery.  Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 570. "Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Twombly, 550 U.S. at 570.

### iii. Statute of Limitations

Plaintiffs seek to recover damages under the ADA/RA on the ground that DCF's decision to invoke a 96-hour hold (as happened with Kristina and Daniel) was motivated by impermissible discrimination on the basis of disability.[22]  This claim may not be precluded by Rooker-Feldman or collateral estoppel.  E.g., Schweitzer v. Crofton, 935 F. Supp. 2d 527, 540-45 (E.D.N.Y. 2013), aff'd, 560 F. App'x 6 (2d Cir. 2014); Phifer, 289 F.3d at 59.  However, it is barred by the three-year statute of limitations.

The parties agree that the relevant statute of limitations is three years, pursuant to Conn. Gen. Stat. § 52-577.  See Kloth-Zanard v. Malloy, No. 3:15-CV-00124 (MPS), 2016 WL 5661977, at *7 n.5 (D. Conn. Sept. 29, 2016).  Plaintiffs do not dispute that "[f]ederal law governs the question of when a federal claim accrues."  Morse v. Univ. of Vt., 973 F.2d 122,

---

[22] The amended complaint alleges that "DCF moved too hastily to remove the children."  Am. Compl. ¶ 99.

125 (2d Cir. 1992).  Under federal law, limitation periods start

to run when the allegedly discriminatory act occurs, not when

its effects are felt.  Chardon v. Fernandez, 454 U.S. 6, 8

(1981).  Because plaintiffs filed their original complaint on

December 13, 2013, the statute of limitations bars any claims

related to discriminatory acts occurring before December 13,

2010.

Plaintiffs argue that equitable tolling should apply.  But

that possibility "is foreclosed by Connecticut precedent, which

establishes Conn. Gen. Stat. § 52-577 as a statute of repose not

susceptible to equitable tolling."  Gerena v. Korb, 617 F.3d

197, 206 (2d Cir. 2010).

The applicability of Connecticut's continuing course of

conduct doctrine requires more comment.  This doctrine is

"understood to be a tolling mechanism."  Lee v. Dep't of

Children & Families, 939 F. Supp. 2d 160, 171 (D. Conn. 2013).[23]

"[T]o support a finding of a continuing course of conduct that

may toll the statute of limitations, there must be evidence of

the breach of a duty that remained in existence after commission

---

[23] "Most Connecticut case law regarding the continuing course of
conduct doctrine deals with medical malpractice, legal
malpractice, or situations in which there are continuing
misrepresentations," not discrimination.  Lee, 939 F. Supp. 2d
at 172 (citation omitted).  However, in Lee, the court found
that the plaintiff sufficiently alleged "that the defendants
failed on a continuing basis to accommodate her disability"
within the limitations period.  Id.

of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong." Id. at 171-72 (emphasis omitted) (quoting Neuhaus v. DeCholonky, 280 Conn. 190, 201-02 (2006)). This presents a problem for plaintiffs because their parental rights were originally terminated in a court order of October 2008.

Plaintiffs contend that any statute-of-limitations argument is procedurally defective because it depends on facts neither alleged in the complaint nor incorporated by reference. But the complaint explicitly refers to the order of October 2008. Am. Compl. ¶ 77. "Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss." Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir. 1989). And judicial notice may be taken of the fact of a prior court order. E.g., Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425-26 (2d Cir. 2008).

The October 2008 order was not overturned until June 2010. In re Joseph W., Jr., 121 Conn. App. 605 (2010). DCF had a duty not to discriminate against plaintiffs regarding Daniel and Joseph Jr. until October 2008, when their parental rights were terminated. But DCF cannot have owed a duty to plaintiffs while the state court's initial termination of their parental rights

applied from 2008 until at least June 2010.[24]  At best,
therefore, any continuing course of conduct began no earlier
than June 2010.

## 2. Count Two: Associational Discrimination Under The ADA/RA

In count two, plaintiffs allege that Mr. Watley was
discriminated against based on his association with Ms. Hasemann,
who was disabled or perceived to be disabled by DCF, when DCF (1)
removed his sons and (2) disregarded the recommendation of a
psychologist who found that he was not a risk to his sons and
recommended overnight visitation be started.  Am. Compl. ¶¶ 112–
16.

### i. Legal Standard

The Second Circuit has recognized that the RA provides a
cause of action for "associational discrimination" against a
non-disabled person on the basis of their association with a
disabled person.  "[N]on-disabled parties bringing associational

---

[24] See Conn. Gen. Stat. § 17a-111b(a) (ordering DCF to "make
reasonable efforts to reunify a parent with a child unless the
court . . . has approved a permanency plan other than
reunification pursuant to subsection (k) of section 46b-129").
The amended complaint alleges that DCF refused to allow
plaintiffs any visitation after their parental rights were
terminated in October 2008.  Am. Compl. ¶¶ 77, 81.  However, it
was state court orders that prohibited visitation.  See In re
Joseph W., Jr., 53 Conn. Supp. at 72-73, 186-87 ("Although the
parents consistently visited their children until the fall of
2008, they have been unable or unwilling to adequately address
their housing, employment, mental health, medical and parenting
issues. Consequently, their requests to renew contact with the
boys were denied by the court in 2008 and 2011.").

discrimination claims need only prove an independent injury causally related to the denial of federally required services to the disabled persons with whom the non-disabled plaintiffs are associated." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 279 (2d Cir. 2009) (Wesley, J., concurring for majority). See also Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 432 (2d Cir. 2016) (recognizing associational discrimination claim under ADA in employment context). There are subtle but important differences between the tests announced in Loeffler and Graziadio. The Loeffler formulation recognizes liability for injuries caused to a non-disabled party based on discrimination against a disabled party.[25] The Graziadio standard recognizes a claim under the ADA for discrimination against a non-disabled party based on their relationship with a disabled party. See id. (requiring that plaintiff have suffered an "adverse employment action . . . under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.").

---

[25] In Loeffler itself, for example, the Second Circuit held that the children of a deaf father stated an associational discrimination claim because "they were compelled to provide sign language interpretation for the Hospital and were consequently taken out of school and exposed to their father's suffering." 582 F.3d at 279-80. There was no argument that the children themselves were discriminated against.

The amended complaint relies on the Graziadio formulation. See Am. Compl. ¶ 109 (labelling count two as "Intentional Discrimination based on Relationship/Association With an Individual With a Disability"), ¶ 110 ("Mr. Watley was discriminated against based upon his association and/or relationship with Ms. Hasemann."), ¶ 112 ("DCF discriminated against Mr. Watley based on his association and/or relationship with Ms. Hasemann."). I assume for present purposes that this formulation supports a claim under the RA.

Because Graziadio was an employment discrimination case, it provides little guidance as to the requirements for an associational discrimination claim in other contexts. In keeping with Natofsky and Middletown, I conclude that a plaintiff presenting an associational discrimination claim must show that he or she was discriminated against (through disparate impact, disparate treatment, and/or failure to make reasonable accommodations), and that his or her association with a person who is disabled or perceived to be disabled was a but-for cause of the discrimination.[26]

ii. Analysis

---

[26] There are limits on the kinds of associations that count for the purposes of an associational disability claim, but they are not relevant here. See McGRX, Inc. v. Vermont, No. 5:10-cv-1, 2011 WL 31022, at *5 (D. Vt. Jan. 5, 2011).

Like the claims discussed above, Mr. Watley's claim based
on the removal of his sons is precluded by <u>Rooker-Feldman</u> and
collateral estoppel.  Because the same analysis applies, it will
not be repeated here.  To the extent the claim is based on the
initial 96-hour hold with regard to Daniel, it is barred by the
statute of limitations, again for reasons explained earlier.
Finally, to the extent the claim seeks to contest termination of
Mr. Watley's parental rights, it is precluded by the state
courts' findings in connection with the final order of
termination, as also explained above.

Mr. Watley's claim based on the recommendations of his
psychologist is barred by collateral estoppel because of
findings made by the final trial court.  The court found that
both psychologists who diagnosed and treated Mr. Watley "did not
ever recommend the children could be returned immediately to
father's care."  <u>In re Joseph W., Jr.</u>, 53 Conn. Supp. at 116.
The issue was actually litigated and necessary to the judgment
terminating his parental rights.

   3.   <u>Count Three: Retaliation under ADA/RA</u>

Plaintiffs' third count alleges in conclusory terms that
the defendants "intimidated, threatened, coerced, and/or engaged
in discriminatory conduct against Mr. Watley and Ms. Hasemann
after they asserted their rights or requested reasonable
modifications or otherwise engaged in protected activity to

secure their rights" under the ADA and RA.  Am. Compl. ¶ 121.
Somewhat more specifically, the amended complaint alleges that
plaintiffs engaged in good faith protected activity by
requesting modifications and supports, in particular, an ADA
coordinator.  Id. ¶ 119.  In response, the amended complaint
alleges, defendants "[(1)] cancelled Plaintiffs' visitation with
their sons and [(2)] denied their requests for modifications and
additional supports, including [(3)] the ability to seek or
continue to seek treatment from certain providers."  Id. ¶ 122.

i. Legal Standard

"The elements of a retaliation claim under either the
Rehabilitation Act or the ADA are (i) a plaintiff was engaged in
protected activity; (ii) the alleged retaliator knew that
plaintiff was involved in protected activity; (iii) an adverse
decision or course of action was taken against plaintiff; and
(iv) a causal connection exists between the protected activity
and the adverse action."  Natofsky, 921 F.3d at 353 (internal
alterations omitted) (quoting Weixel v. Bd. Of Educ. Of City of
New York, 287 F.3d 138, 148 (2d Cir. 2002)).  The fourth element
may be demonstrated "either '(1) indirectly, by showing that the
protected activity was followed closely by discriminatory
treatment, or through other circumstantial evidence such as
disparate treatment of [others] who engaged in similar conduct;
or (2) directly, through evidence of retaliatory animus directed

45

against the plaintiff by the defendant.'" Id. (quoting

Littlejohn v. City of New York, 795 F.3d 297, 319 (2d Cir.

2015)).

    ii. Analysis

    Plaintiffs' retaliation claim cannot survive application of

Rooker-Feldman and collateral estoppel.  In addition, the

allegations in the amended complaint fail to state a plausible

retaliation claim.

    a. Visitation

    Visitation between plaintiffs and their children was

governed by court orders.  The state courts denied motions for

visitation filed by plaintiffs on May 16, 2008; January 7, 2009;

September 28, 2011; October 23, 2011, and March 11, 2013.  In re

Joseph W., Jr., 53 Conn. Supp. at 5, 9, 72, 73, 74.  Mr. Watley

withdrew one motion for visitation.  Id. at 70.  Ms. Hasemann's

visitation rights were suspended following an incident with a

DCF employee resulting in her arrest, and were later partially

reinstated by court order.  Id. at 71-72.  At one point, both

plaintiffs failed to appeal orders denying motions for

visitation while at the same time appealing other orders.  See

id. at 74, 119.  As explained above, state courts - not DCF -

granted OTCs, set the visitation schedule, approved of various

reunification plans, refused to appoint an ADA coordinator in

connection with the court proceedings, and ultimately terminated

plaintiffs' parental rights.  Under <u>Rooker-Feldman</u>, this court does not have jurisdiction to review those decisions.

Plaintiffs' retaliation claim based on denial of visitation is also precluded by collateral estoppel.  The appropriateness of visitation is based on the best interests of the child, and DCF's visitation determinations are subject to modification by the trial court.  <u>See</u> <u>Conn. Gen. Stat.</u> § 17a–10a.  The trial courts' denials of plaintiffs' visitation motions thus entailed a determination that visitation was not in the best interest of the children.[27]  The issue is not subject to relitigation even though plaintiffs allege a retaliatory motive on the part of DCF.

In addition to being precluded, plaintiffs' claim fails to satisfy the plausibility standard.  Plaintiffs' motions for visitation were denied several times prior to their requests that they be provided an ADA coordinator for their neglect proceedings, which took place in October 2011 and December 2012.

---

[27] The final trial court concluded that "both parents failed to maintain a reasonable degree of safety for the children during supervised visitation," and that "[n]either parent made any measurable progress despite receiving significant parenting and treatment supports and extra visitation time."  <u>In re Joseph W., Jr.</u>, 53 Conn. Supp. at 168–69.  The court concluded that "resuming visits . . . is not in the boys' best interests" because "[w]hen the parents had visitation, they both demonstrated a lack of judgment and poor parenting skills. . . . Reinstating visits may cause the children emotional trauma and a reoccurrence of behavior problems."  <u>Id.</u> at 192.

Id. at 10-11.  Even assuming the denials of visitation can be scrutinized for a possible retaliatory motive, notwithstanding repeated state court findings that the denials were appropriate, the sequence of events makes plaintiffs' retaliation claim implausible.  See Natofsky, 921 F.3d at 353-54 (awarding summary judgment where record indicated plaintiff was demoted prior to taking protected action).

The existence of a non-retaliatory motive also makes the claim implausible.  "Claims for retaliation are analyzed under the burden-shifting framework that is established for Title VII cases."  Harvin v. Manhattan & Bronx Surface Transit Operating Auth., 767 Fed. App'x 123, 128 (2d Cir. 2019) (citing Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)).  Once a plaintiff establishes a prima facie case of retaliation, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision.  If a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the [defendant's] explanation is merely a pretext.'"  Treglia, 313 F.3d at 721 (quoting Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)).  Plaintiffs cannot meet this burden.

   b. Denial of Requests for Support and Modifications

Plaintiffs next claim that DCF retaliated against them for requesting modifications and supports by refusing to grant such requests.  This theory is foreclosed as a matter of law.  "Defendants' alleged failure to accommodate [plaintiffs'] disability subsequent to an ADA . . . protected request cannot be bootstrapped into a viable disability retaliation claim." Missick v. City of New York, 707 F. Supp. 2d 336, 356 (E.D.N.Y. 2010) (citing Gomez v. Laidlaw Transit, Inc., 455 F. Supp. 2d 81, 90 (D. Conn. 2006) ("[A] failure to accommodate cannot constitute retaliation for an employee's request for accommodation.")).  If a plaintiff requests accommodation, there are two possible outcomes: acceptance of the request or denial.  Denial of a non-meritorious request is a correct decision, not retaliation.  Denial of a meritorious request is, by definition, disability discrimination for failure to accommodate.  It cannot also be the basis of a retaliation claim.

Moreover, a claim that DCF retaliated against the plaintiffs by denying requests for accommodations is precluded.  "It is well established that when the department takes custody of a minor child, the trial court has the authority to issue specific steps to the department to facilitate reunification with the parents."  In re Leah S., 284 Conn. 685, 696 (2007) (emphasis added).  As discussed above, the decisions about which

plaintiffs complain were decisions of the state courts, and I do not have jurisdiction to review them.

### c. Interference with Treatment from Preferred Providers

Finally, plaintiffs allege that DCF retaliated against them by interfering with their ability to seek or continue to seek treatment from their preferred providers. However, Ms. Hasemann's treatment with Ms. Guest was terminated by court order, not DCF. Plaintiffs also allege that "DCF contacted [Mr. Watley's] psychologist and the psychologist then attempted to convince" Mr. Watley to plead nolo contendre to DCF's termination petition, causing him to "los[e] all confidence in the psychologist." Am. Compl. ¶ 71. Plaintiffs do not state when this alleged contact occurred or whether it followed any protected activity. Accordingly, there are no allegations that allow for a reasonable inference of a causal connection between protected activity and this contact.

### 4. Count Four: Violation of Constitutional Rights Under § 1983

Plaintiffs seek money damages against former Commissioner Katz under § 1983 for depriving them of a Fourteenth Amendment right to substantive due process. They allege that she violated this right by (1) denying them the fundamental right to parent their children, and (2) taking the position that the ADA and RA did not apply to DCF's programs or services. Am. Compl. ¶¶ 128–

34.[28]  I agree with the defendants that plaintiffs' claim under §
1983 is foreclosed by Rooker-Feldman and the statute of
limitations.  I also agree that plaintiffs have failed to plead
the elements of a cognizable substantive due process claim and
any such claim is barred by qualified immunity.

    i.    Rooker-Feldman

    In Hoblock, as mentioned earlier, the Second Circuit stated
that a substantive due process claim arising from termination of
parental rights in state court would be foreclosed by Rooker-
Feldman.  See 422 F.3d at 87.  That is the situation presented
here.  Numerous other courts have applied Rooker-Feldman to bar
claims in similar circumstances.  See Voltaire, 2016 WL 4540837,
at *10 (collecting cases); see also Edem v. Spitzer, 204 F.
App'x 95, 96-98 (2d Cir. 2006) (dismissing procedural due
process claim predicated on paternity proceedings); Johnson v.
Queens Admin. for Children's Servs., 197 F. App'x 33, 34 (2d
Cir. 2006) ("[T]o the extent that [plaintiff] was asserting
[constitutional] claims regarding the adequacy of the Family
Court proceedings, the District Court lacked subject matter

_____

[28] Plaintiffs also allege a violation of their fundamental right
to parent their children under the First and Ninth Amendments.
However, in this Circuit, claims "addressing the right to
intimate association vis-a-vis parent-child relationships" are
analyzed "under the principles of substantive due process rather
than the First Amendment."  Uwadiegwu v. Dep't of Soc. Servs. of
the Cty. of Suffolk, 91 F. Supp. 3d 391, 398 (E.D.N.Y. 2015),
aff'd, 639 F. App'x 13 (2d Cir. 2016).

jurisdiction under the Rooker-Feldman doctrine." (citation omitted)).  Plaintiffs' claim under § 1983 must be dismissed on this basis.

    ii.  <u>Statute of Limitations</u>

Plaintiffs' § 1983 claim alleging deprivation of the right to parent their children also encounters the same statute of limitations problem as the claims under the ADA and RA.  Once "court confirmation of the basis for removal is obtained, any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child." <u>Southerland v. City of New York</u>, 680 F.3d 127, 153 (2d Cir. 2012) (citations omitted).  In other words, plaintiffs can recover for a constitutional violation only on the basis of the separation that preceded court confirmation – here, the 96-hour holds.  See <u>Mortimer v. City of New York</u>, NO. 15-cv-7186(KPF), 2018 WL 1605982, at *15 (S.D.N.Y. Mar. 29, 2018) (dismissing for failure to state a claim mother's allegation of substantive due process violation because child's separation was pursuant to a court order).  Section 1983 claims are subject to Connecticut's three-year personal injury statute of limitations. See <u>Lounsbury v. Jeffries</u>, 25 F.3d 131, 133–34 (2d Cir. 1994).  The 96-hour holds occurred long before the filing of this action (and well before former Commissioner Katz arrived at DCF).

iii. <u>Failure to State a Claim</u>

Plaintiffs' claim that former Commissioner Katz deprived them of a right to parent their children is unsupported by allegations permitting a reasonable inference that she was personally involved in any such deprivation. She became DCF commissioner in February 2011, and plaintiffs complain primarily of actions taken by DCF prior to 2008. <u>See</u> Am. Compl. ¶ 81 (noting that plaintiffs "have had no contact or visitation" with their sons since 2008); <u>In re Joseph W.</u>, 53 Conn. Supp. at 7-8 (noting that plaintiffs' parental rights were terminated in October 2008 and that the Supreme Court did not overturn the decision until June 28, 2011).[29] Because former Commissioner Katz did not become Commissioner until long after DCF took custody of the children, and years after plaintiffs last visited the children, the plausibility standard requires plaintiffs to allege specific acts or omissions on her part permitting a reasonable inference of a causal connection between her conduct and the loss of plaintiffs' right to parent the children. In other words, for this claim to cross the plausibility threshold, plaintiffs must allege facts showing what this defendant did or

---

[29] The court may, on a motion to dismiss, take judicial notice of the date of appointment or election of a public official to demonstrate that the official could not have been personally implicated in a constitutional violation under § 1983. <u>See</u> <u>Gladden</u>, 2013 WL 4647193, at *3.

failed to do after 2011 that caused them to lose their parental rights.  In the absence of such allegations, the claim must be dismissed.

Plaintiffs claim that former Commissioner Katz violated their rights under the Due Process Clause by taking the position that the ADA did not apply to DCF's activities.  Construed favorably to the plaintiffs, the allegation appears to be that if she had recognized the applicability of the ADA earlier in her tenure as Commissioner, they would have regained custody. Viewed in light of the final trial court's finding that DCF's reunification efforts were "extraordinary," this allegation is too vague to satisfy the plausibility standard.

Moreover, "[t]o state a claim for a violation of th[e] substantive due process right of custody, a plaintiff must demonstrate that the state action depriving him of custody was 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'"  Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 275 (2d Cir. 2011) (quoting Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999)).  Plaintiffs cannot show that former Commissioner Katz's failure to recognize the applicability of the ADA prior to the final termination of their parental rights supports a substantive due process claim under this stringent test.  See Cty. of Sacramento v. Lewis, 523 U.S.

833, 846 (1998) ("[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense . . . ." (quotation marks and citation omitted)).

    iv. Qualified Immunity

Public officials are protected from being sued for damages under § 1983 if "their conduct does not violate clearly established constitutional rights" or if "it was objectively reasonable for them to believe their acts did not violate those rights." Holcomb v. Lykens, 337 F.3d 217, 220 (2d Cir. 2003). "A district court may grant a motion to dismiss based on this qualified immunity if 'the facts supporting the defense appear on the face of the complaint.'" Hyman v. Abrams, 630 Fed. App'x 40, 42 (2d Cir. 2015) (quoting McKenna v. Wright, 386 F.3d 432, 435-36 (2d Cir. 2004)). Moreover, a court may conclude that qualified immunity applies without first determining that a federal right has been violated. See Pearson v. Callahan, 555 U.S. 223, 237 (2009). Following this approach, I conclude that even if plaintiffs could allege a violation of their right to substantive due process by former Commissioner Katz, qualified immunity would require that any such claim be dismissed.

Qualified immunity applies because it was not "clearly established at the time of the alleged misdeeds" that a state officer violated a parent's substantive due process rights by failing to direct the implementation of ADA policies and

programs in child custody, neglect, and TPR proceedings.  See

Holcomb, 337 F.3d at 220 (quoting Patel v. Searles, 305 F.3d

130, 135 (2d Cir. 2002)).  A constitutional right is clearly

established for purposes of qualified immunity under § 1983 if

"existing precedent . . . placed the statutory or constitutional

question beyond debate."  Cugini v. City of New York, 931 F.3d

604, 615 (2d Cir. 2019) (quoting Ashcroft v. al-Kidd, 563 U.S.

731, 741 (2011)).  Plaintiffs need not point to "a case directly

on point," but must nonetheless find either "cases of

controlling authority in their jurisdiction at the time of the

incident" or "a consensus of cases of persuasive authority such

that a reasonable officer could not have believed that his

actions were lawful."  See al-Kidd, 563 U.S. at 741, 746.

Plaintiffs identify no such precedent.  Rather, they cite cases

discussing the substantive protection the Due Process Clause

provides to the family relationship.  See Plf. Mem. at 35

(citing Patel v. Searles, 305 F.3d 130, 136 (2d Cir. 2002)

(noting that the parent/child relationship warrants

constitutional protection); Adler v. Pataki, 184 F.3d 35, 42 (2d

Cir. 1999) (noting the existence of an individual right to

intimate association); Tenenbaum v. Williams, 193 F.3d 581, 600

(2d Cir. 1999) (noting that the familial relationship is

protected by the Due Process Clause)).  The cited cases do not

demonstrate that the right allegedly violated here was clearly established.

The Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality." Kisela v. Hughes, -- U.S. --, 138 S. Ct. 1148, 1152 (2018). Just as a court may not reject a qualified immunity defense because "the right to be free from excessive force" was clearly established, qualified immunity cannot be denied in the circumstances presented here simply because the right to the sanctity of familial relationships was clearly established. See, e.g., City of Escondido v. Emmons, -- U.S. --, 139 S. Ct. 500, 503 (2019) (holding that the Ninth Circuit "contravened . . . settled principles" by "defin[ing] the clearly established right at a high level of generality" as the right to be free from excessive force and, "[w]ith the right defined at that high level of generality," denying qualified immunity).

Plaintiffs provide one citation to a Supreme Court case for the proposition that it was clearly established that the ADA applied to DCF's programs. See Plf. Mem. at 36 (citing Penn. Dep't of Corrections v. Yeskey, 524 U.S. 206, 209 (1998)). Plaintiffs' quotation of Yeskey is taken out of context.[30]

_____

[30] Plaintiffs cite Yeskey for the proposition that "Title II [of] the ADA and the Rehabilitation Act extends to all programs, services, and activities of a state and its agencies, 'without any exception.' Yeskey, 524 U.S. at 209." Plf. Mem. at 36.

Moreover, even if Yeskey could be viewed as clearly establishing that the ADA literally applies to all state programs, including DCF's, Yeskey did not clearly establish that DCF's subsequent failure to implement the ADA would violate a right to substantive due process.  The decision in Yeskey contains no discussion of such a constitutional right.

No case has been cited or found that treats a state agency's failure to implement the ADA as a violation of substantive due process.  Cf. Spring v. Allegany-Limestone Cent. Sch. Dist., 655 Fed. App'x 25 (2d Cir. 2016) (holding that plaintiffs had stated an ADA/RA claim but not a substantive due process claim).  The Supreme Court has cautioned against bootstrapping a statutory violation into a constitutional violation.  See Davis v. Scherer, 468 U.S. 183, 194 ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.").  Accordingly, former Commissioner Katz is entitled to qualified immunity.

C.  Claim For Injunctive Relief

---

The full quote from Yeskey states: "Here, the ADA plainly covers state institutions without any exception that could cast the coverage of prisons into doubt."  524 U.S. at 209 (emphasis added).  Unlike the operation of state prisons, family law is an area that Congress and the Supreme Court has largely entrusted to state authorities.

In a proper case, injunctive relief is available against DCF under the ADA/RA and against the incumbent Commissioner of DCF (here defendant Dorantes) under § 1983.  The amended complaint seeks injunctive relief in the form of an order

(i)     requiring defendants to develop and implement policies and procedures addressing how ADA and Rehabilitation Act requirements apply to DCF programs, services and activities, including assessments, service planning and implementation, visitation, family support and safety requirements;

(ii)    requiring defendants to complete a self-assessment, to inform parents with mental and/or psychological disabilities of their rights and DCF's obligations under the ADA and Rehabilitation Act; [and]

(iii)   requiring defendants to implement a training program for all investigators, social workers, supervisors on the requirements and how DCF seeks to comply with the ADA and Rehabilitation Act with respect to its programs and services;

Am. Compl. at 27.

Defendants oppose plaintiffs' claim for injunctive relief on the same grounds they oppose the claims for damages.  In addition, they contend that, under Article III of the Constitution, plaintiffs lack standing to seek the injunctive relief set forth above.  Though the issue of plaintiffs' standing under Article III is not free from doubt, I conclude that their allegations are insufficient to confer standing.

Article III limits the judicial power of the federal courts to adjudicating "cases" and "controversies."  The requirement of standing serves to implement this limitation.  The requirement "applies to each claim and form of relief sought."  <u>New York v.</u>

U.S. Dep't of Homeland Sec., -- F. Supp. 3d --, 2019 WL 5100372, at *3 (S.D.N.Y. 2019) (internal citations omitted). The requirement applies with particular force to claims for injunctive relief against governmental bodies in the nature of institutional reforms requiring significant public expenditures. As the Supreme Court has stated, without a "real need to exercise the power of judicial review, . . . allowing courts to oversee legislative or executive action would significantly alter the allocation of power  . . . away from a democratic form of government."  Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (internal quotations omitted).

To establish that they have standing, plaintiffs must satisfy three elements:

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not  . . . the result of the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations omitted).

"Past injuries . . . do not confer standing to seek injunctive relief unless the plaintiff[s] can demonstrate that

[they are] likely to be harmed again in the future in a similar way." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016); see also Steel Co. v. Citizens for a Better Env., 523 U.S. 83, 109 (1998) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974))). Nor can plaintiffs establish standing based on their desire to prevent DCF from discriminating against others, no matter how sincere their desire may be. A plaintiff "may not seek redress for injuries done to others." Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 166 (1972); cf. Spokeo, Inc. v. Robins, -- U.S. --, 136 S. Ct. 1540, 1547 n.6 (2016) ("[E]ven named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'" (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 40, n.20 (1976))).

To have standing to pursue injunctive relief, plaintiffs must allege (1) that they are currently experiencing harm due to DCF's illegal activity against them in the past, see Steel Co., 523 U.S. at 109, or (2) that they face a substantial likelihood of harm due to illegal activity by DCF in the future. See Nicosia, 834 F.3d at 239. As to the first possibility, the

amended complaint alleges that plaintiffs continue to experience

emotional distress resulting from DCF's actions culminating in

termination of their parental rights.  See Am. Compl. ¶ 81-84.

Accepting this allegation as true, plaintiffs' emotional

distress does not give them standing to seek the injunctive

relief requested by the amended complaint unless they can show a

"substantial likelihood" that the injunctive relief –

essentially, an order directing DCF to implement the ADA – will

redress their emotional harm.  See Vt. Agency of Nat. Res. V.

U.S. ex rel. Stevens, 529 U.S. 765, 771 (2000).  Plaintiffs do

not make this showing in responding to the motion to dismiss.

See Plf. Mem. at 38-39.  And it is difficult to see how such an

injunction can relieve plaintiffs of the emotional distress they

are likely to continue to suffer as a result of losing custody

of their children.[31]

---

[31] In reaching this conclusion, I recognize that loss of parental
rights can harm an individual's self-image, sense of self-worth,
and reputation, which is a discrete type of harm different from
the emotional distress caused by being separated from one's
children.  This type of harm is likely to be significant in most
(if not all) cases involving loss of parental rights, and it may
be especially painful for a person who has (or is perceived to
have) a mental or psychological disability.  I also recognize
that this type of injury might even well be relieved to a
considerable extent by the prospect of being able to help bring
about institutional reform of a state agency (not to mention
actually obtaining such relief), as plaintiffs seek to do here.
However, I conclude that even if this type of injury can be
relied on to establish standing to seek injunctive relief in the
nature of institutional reform, plaintiffs do not have standing
because developments at both the federal and state level since

As to the second possibility, plaintiffs have the burden of alleging facts showing "a sufficient likelihood that [they] will be affected by [DCF's] allegedly unlawful conduct in the future." Holmes v. Patllito, No. 5:12-cv-183, 2012 WL 6623794, at *2 (D. Vt. Nov. 28, 2012) (quoting Wooden v. Bd. Of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1283 (11th Cir. 2001)), adopted by 2012 WL 6623690 (D. Vt. Dec. 19, 2012). Plaintiffs allege that they are currently caring for other children and plan to try to have or adopt other children. Am. Compl. ¶ 88-89. Accordingly, they argue, they "face the real risk that DCF may investigate or take other action against them based on their continued care and supervision of children." Plf. Mem. at 38. These allegations, accepted as true, are insufficient to demonstrate the "substantial likelihood" of future injury necessary for standing. In Lujan, the Supreme Court rejected an attempt to establish standing based on future possibilities. The Court stated: "Such 'some day' intentions, without any description of concrete plans, or indeed even any specification of when the some day will be - do not support a finding of the 'actual or imminent injury' that our cases require." See 504 U.S. at 564. Similarly, the possibility that DCF may one day

_____

this action was filed, summarized below, prevent them from demonstrating that this case involves a "real need to exercise the power of judicial review." Summers, 555 U.S. at 493.

seek to take action against either or both plaintiffs is necessarily conjectural rather than imminent.[32]

Plaintiffs do not attempt to distinguish their position from the case on which defendants principally rely, City of Los Angeles v. Lyons, 461 U.S. 95 (1983).  Lyons alleged that a police officer put him in a chokehold during a traffic stop, and sought an injunction broadly prohibiting police from using chokeholds.  The Court concluded that Lyons' allegations of past misconduct "d[id] nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part."  Id. at 105.  Moreover, Lyons' allegation that the Los Angeles police "routinely appl[ied] chokeholds . . . [fell] far short of the allegations that would be necessary to establish a case or controversy between these two parties."  Id.

---

[32] Plaintiffs' allegation that DCF might take action against them is not unlike an allegation of a threat of future prosecution; to adequately demonstrate such an injury, a plaintiff cannot rely on a prosecution that is only "remotely possible."  Am. Charities for Reasonable Fundraising Regulation, Inc. v. Shiffrin, 205 F.3d 1321, at *1 (2d Cir. 2000).  In American Charities, the Second Circuit held that much more detailed allegations than those presented here were insufficient to plausibly allege a threat of future prosecution.

Unlike Lyons, plaintiffs have alleged that they may one day undertake to have or adopt children, which could cause DCF to take action.  See id. at 106 n.7 (suggesting that Lyons needed to "credibly allege that he faced a realistic threat from the future application of the City's policy").[33]  However, as defendants argue and as discussed above, plaintiffs' allegation that they plan to try to have or adopt children in the future is inadequate under the standard set forth in Lujan.

Plaintiffs' would have a stronger argument for standing if they alleged facts permitting a finding that they are refraining from trying to have or adopt children because they fear DCF will take action against them in violation of their federal rights.  Even then, however, they would need to allege facts showing a sufficient likelihood that DCF would act in violation of their rights.  Significant developments since this action was filed prevent them from demonstrating such a sufficient likelihood.

In 2015, while the present action was on appeal, the U.S. Departments of Justice and Health and Human Services published a

---

[33] Lyons remains somewhat problematic for plaintiffs because the amended complaint alleges that they currently care for children, and there is no indication that DCF, although necessarily aware of plaintiffs' allegation, has engaged in any discriminatory conduct against them.  This is not to suggest that if DCF were to find out in the future that Ms. Hasemann was expecting a child or seeking to adopt one, it would take no action.  For purposes of this ruling, I assume that, at a minimum, DCF would conduct an investigation.

joint letter stating that Title II of the ADA does apply to programs of state child protection agencies.[34]  The letter has been called "historic" and "ground-breaking."  Charisa Smith, Making Good on an Historic Federal Precedent: Americans with Disabilities Act (ADA) Claims and the Termination of Parental Rights of Parents with Mental Disabilities, 18 Quinnipiac Health L.J. 191, 192 (2015).  HHS is now actively engaged with state agencies regarding compliance with ADA standards in neglect and TPR proceedings.[35]  State courts have also taken steps to ensure that child protection proceedings comport with the ADA.  See, e.g., In re Hicks/Brown, 893 N.W.2d 637, 640-41 (Mich. 2017) (holding that state agency had "duty under the ADA to reasonably accommodate a [parent's] disability" before terminating parental rights).

---

[34] See U.S. Dep't of Justice, Civil Rights Division & U.S. Dep't of Health & Human Servs., Office for Civil Rights, Letter to Erin Deveney, Interim Comm'r of Dep't of Children & Families, Commonwealth of Massachusetts (hereinafter "DOJ/HHS Letter") (Jan. 29, 2015), available at: http://www.ada.gov/ma_docf_lof.pdf.

[35] See, e.g., Press Release, HHS OCR Secures Voluntary Resolution and Ensures Child Welfare Programs in the Oregon Department of Human Services Protect Parents with Disabilities from Discrimination, U.S. Dep't of Health & Human Servs. (Dec. 4, 2019), available at: https://www.hhs.gov/about/news/2019/12/04/hhs-ocr-secures-voluntary-resolution-and-ensures-child-welfare-programs-in-the-odhs-protect-parents-with-disabilities-from-discrimination.html.

In 2016, in keeping with the DOJ/HHS letter, then-Commissioner Katz issued a memorandum stating: "Qualified individuals with a disability in child protection matters are entitled to individual assessments of their needs and full and equal access to opportunities to benefit from and participate in child welfare programs, services and activities that are equal to those extended to persons without disabilities."[36]  Other publicly available documents issued by DCF described efforts to help train service providers to assist persons with cognitive limitations, and provided guidance to DCF caseworkers working with parents with disabilities.[37]  In addition, the Connecticut Supreme Court recently confirmed that the requirements of the ADA are incorporated into Connecticut antidiscrimination law

---

[36] See Memorandum from Joette Katz, Americans with Disabilities Act, Conn. Dep't of Children & Families (Sept. 23, 2016), available at: https://portal.ct.gov/-/media/DCF/Diversity/2016ADAPolicyNoticeSignedpdf.pdf ().  See also Nat. Res. Def. Council v. Dep't of Interior, -- F. Supp. 3d --, 2019 WL 4601722, at *9 (S.D.N.Y. 2019) (taking judicial notice of publicly available government documents).

[37] Joette Katz, Annual Progress and Services Report 2017, Conn. Dep't of Children & Families (June 30, 2016), available at: https://portal.ct.gov/-/media/DCF/DataConnect/pdf/APSR-2017-06302016--Final.pdf (noting that the Connecticut Parents with Cognitive Limitations Work Group, headed by DCF, "has trained close to 3,100 service providers through the work of an interdisciplinary, interagency rotating training team."); Conn. Dep't of Children & Families, Early Childhood Practice Guide for Children Aged Zero to Five (April 1, 2016), at 39-43, available at: https://portal.ct.gov/-/media/DCF/Policy/BPGuides/3-1-PG-Early-Childhood.pdf (providing guidance to caseworkers on assisting parents with disabilities).

applicable to neglect and TPR proceedings.  See In re Elijah C.,
326 Conn. 480, 511 (2017) ("[T]here is nothing in the record
before us to suggest that the trial court deviated in any way
from ADA principles, which . . . are incorporated by reference
into our state's own stringent antidiscrimination statutes, in
adjudicating the neglect and termination petitions in the
present case.").

Plaintiffs argue that, "given the quick timing required in
child protections proceedings, DCF's actions would evade review"
unless an injunction were already in place.  Plf. Mem. at 39.
The concept of an injury "evading review" is an exception to the
mootness doctrine for injuries "too short to be fully litigated
prior to [their] cessation or expiration." United States v.
Sanchez-Gomez, -- U.S. --, 138 S. Ct. 1532, 1540 (2018).  The
exception does not apply here.  Moreover, the possibility that
future plaintiffs – or these plaintiffs in the future – could
encounter an argument about mootness does not relieve plaintiffs
of their obligation to satisfy standing requirements.  Cf.
Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208,
227 (1974) ("The assumption that if respondents have no standing
to sue, no one would have standing, is not a reason to find
standing.").

Plaintiffs may be concerned that if they wait to request
injunctive relief until DCF invokes a 96-hour hold and seeks an

OTC, their request will be too late because, under the principle

of Younger v. Harris, 401 U.S. 37 (1971), the federal court will

have to abstain from interfering in what will then be an ongoing

state proceeding.  See Sprint Communications, Inc. v. Jacobs,

571 U.S. 69, 72-73 (2013).  This possibility does not confer

standing under Article III when the plaintiff's allegations do

not support a finding that he or she faces an "imminent" injury,

as required by the Supreme Court.  Accordingly, I conclude that

plaintiffs lack standing.

## IV. Conclusion

For the foregoing reasons, defendants' motion to dismiss

the amended complaint is hereby granted.

If plaintiffs believe they can further amend their

allegations to state a claim that is not precluded and on which

relief may be granted, they may file and serve a motion for

leave to amend on or before January 24, 2020.  The motion must

be supported by a memorandum, with the proposed second amended

complaint attached as an exhibit.  If no such motion is filed,

the amended complaint will be dismissed with prejudice and the

Clerk will enter judgment accordingly.

So ordered this 23rd day of December 2019.


          /s/ RNC
          Robert N. Chatigny
          United States District Judge